# IN THE SUPREME COURT OF TEXAS

════════════
No. 17-0409
════════════

CHARLES J. HUGHES, PETITIONER,

v.

TOM GREEN COUNTY, RESPONDENT

═══════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════════

**Argued October 30, 2018**


JUSTICE DEVINE delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE GUZMAN, and JUSTICE BLACKLOCK joined.

JUSTICE BOYD filed a concurring opinion, in which JUSTICE LEHRMANN and JUSTICE BROWN joined.


This interlocutory appeal arises from a dispute in probate over title to property bequeathed in a will. Two beneficiaries under the will and the decedent's heirs each claimed the property. During the litigation, the heirs and one of the beneficiaries, a county, agreed to combine forces against the other beneficiary, a private university. The county and heirs agreed to share equally in any recovery each or either of them obtained in the proceedings. The university subsequently agreed to settle the litigation by paying $1 million to the other parties collectively in return for the release

of their claims and the confirmation of title in the university. The settlement was divided between the county and the heirs under their agreement.

Later, one of the heirs sued the county, alleging among other things that the county breached a material term of their agreement. The county responded with a plea to the jurisdiction, asserting that governmental immunity barred the heir's suit on the agreement. The trial court agreed and dismissed the heir's claim. On appeal, the heir complained that the trial court's order was erroneous because it conflicted with *Texas A&M University–Kingsville v. Lawson*, 87 S.W.3d 518 (Tex. 2002) (plurality op.). That decision holds that a governmental entity that settles a suit in which it lacks immunity cannot claim immunity in a subsequent suit to enforce the settlement. *Id*. at 522-23.

The court of appeals affirmed the trial court's order, concluding that *Lawson* did not apply for two reasons: (1) the agreement between the heirs and the county in the probate proceeding was not a settlement agreement, and (2) even if it was, the agreement "did not settle claims for which the County's immunity was waived." 553 S.W.3d 1, 6-8 (Tex. App.—Austin 2017). We disagree because the county did not have immunity for the claims raised by its intervention in the probate proceeding and because the agreement between the county and the heirs in that proceeding settled their existing adversity. Following the analysis in *Lawson*, we reverse the court of appeals' judgment and remand the cause to the trial court for further proceedings.

I

In his Last Will and Testament, Duwain E. Hughes, Jr., of San Angelo, left "all of [his] interest in the oil, gas and other minerals in what is known as the DUWAIN E. HUGHES RANCHLANDS in Reagan and Irion Counties" to Southern Methodist University (SMU) for the

2

purpose of establishing an endowed chair in the English Department. Hughes also left his home and all its contents, including his rare book and music collections, to Tom Green County. He directed that his home should be used as a branch library to be known as the "Duwain Hughes Branch of the Tom Green County Library." He provided further that the Library Board could sell the house and use the proceeds to buy new books and materials for the county library if that were a more beneficial use. Finally, Hughes devised the residue of his estate to the Tom Green County Library so that "some funds [might be] available for paying off any indebtedness against [his] home and for upkeep and for the purchase of new books."

By 1991, SMU's proceeds from the Ranchlands' oil and gas production exceeded $1.5 million, the highest level of funding for an English Department chair at the university. In an action styled *In re the Will of Duwain E. Hughes, Jr.*, in Tom Green County, SMU's Board of Trustees filed an application to release the restriction on the use of the bequest, seeking authority to use the excess funds for other purposes in SMU's English Department (the SMU Litigation). Tom Green County intervened, alleging that the testator's intent to establish and fund a single endowed chair at SMU had been accomplished. The County claimed it was therefore entitled to "all excess proceeds" under the will's residuary clause for the Tom Green County Library.

Later, Charles Hughes, the testator's nephew, intervened in the SMU Litigation on behalf of the testator's heirs at law, seeking title to the mineral interests claimed both by SMU and the County and praying for judgment against them both. He alleged that the will's grant to SMU of a vested remainder for the specific purpose of endowing a single chair was defeated once the chair was funded, resulting in "title to the remaining properties immediately rever[ting] to Hughes's heirs

3

at law." Charles Hughes also alleged the County Library's sale of the testator's home and its contents caused the limited purpose of the will's residuary clause to lapse, creating a partial intestacy, entitling the heirs at law, not the County, to the disputed mineral interests and proceeds. The heirs thus turned the County's lapsed bequest theory back against the County.

The probate court directed the parties to mediate their competing claims. Before mediating with SMU, however, the County and heirs entered into a Mutual Partial Assignment (MPA) agreement to present a unified defense to SMU's request to lift the restrictions on its bequest. In this agreement, the County and heirs agreed to share equally in any recovery in the lawsuit by assigning each other an undivided 50% of their respective interests in the contested minerals and proceeds. The parties "control over prosecution and/or settlement of the litigation" was also shared jointly. The agreement additionally provided that the heirs would "retain and/or be assigned herein all executive rights" should the respective claims of either party to the minerals and proceeds succeed. The MPA agreement thus resolved the parties' claims against each other for purposes of the SMU Litigation. The agreement also contained a conditional provision that is at the heart of the present dispute. That provision stated the County would name the main library in honor of Duwain E. Hughes, Jr., "if the commissioners consider the County's ultimate recovery in the cause to be substantial enough for such recognition."

At the mediation ordered by the probate court, Hughes and the County collectively settled their title claims against SMU for $1 million and agreed to release their adverse claims to the minerals. The SMU Litigation concluded with the probate court rendering judgment on the releases,

which vested title to the disputed minerals in SMU. Under the MPA's terms, the heirs and the County each received $500,000.

With its part of the settlement, the County began planning for a new library. The plans were beset by financial challenges, however, and the project languished for more than a decade. In 2006, Steve and Pollyanna Stephens initiated a new fundraising effort. This effort ultimately raised $16 million for the library, which included a $3 million donation from the Stephens Family.

The County decided to recognize the Stephenses' generosity and efforts by attaching their family name to the new library. The County also decided to honor Duwain E. Hughes by putting his name on the library's Audio Visual Department. Mindful of the MPA agreement with Hughes's heirs, the commissioners court also resolved that the $500,000 recovery from SMU was "not substantial enough" to name the library for Hughes.

Charles Hughes thought the recovery in the SMU Litigation substantial enough to warrant this honor for his uncle, however, and sued the County for the slight. The suit sought money damages and a declaration that the commissioners' vote to put the Stephens' name on the library was void because it did not comply with the Texas Open Meetings Act.

The County responded with a plea to the jurisdiction, arguing that governmental immunity barred Hughes's damages claim. The trial court granted the County's plea, dismissing all claims pertaining to the parties' MPA agreement. Hughes appealed. The appeal was interlocutory, however, because the order did not dispose of Hughes's open-meetings claim. *See* TEX. CIV. PRAC. & REM. CODE § 51.014 (authorizing appeal from certain interlocutory orders). The court of appeals

affirmed the trial court's order, concluding the County indeed could not be sued for allegedly breaching its agreement in the prior probate proceeding. 553 S.W.3d 7-8. Hughes appealed again.

II

As a preliminary matter, the County challenges our jurisdiction to review the interlocutory order underlying this appeal. The Texas Civil Practice and Remedies Code authorizes the appeal of an interlocutory order that "grants or denies a plea to the jurisdiction by a governmental unit" such as the County here. TEX. CIV. PRAC. & REM. CODE § 51.014(8). When the trial court signed the interlocutory order in this case, however, our jurisdiction over the ensuing interlocutory appeal depended on the existence of a dissent in the court of appeals or a conflict with a prior appellate decision. *See Pidgeon v. Turner*, 538 S.W.3d 73, 81 (Tex. 2017) (citing provisions of the Texas Government Code now repealed). But in 2017, the 85th Texas Legislature greatly simplified the byzantine statutes that previously governed this Court's appellate jurisdiction. *See* Act of May 19, 2017, 85th Leg., R.S., ch. 150, 2017 Tex. Gen. Laws 291. Part of that simplification was to grant the Court general appellate jurisdiction over interlocutory appeals. *See* TEX. GOV'T CODE § 22.001(a) (authorizing appellate review "of an appealable order or judgment" presenting "a question of law that is important to the jurisprudence of the state").

The parties here argue about our appellate jurisdiction under the former law. Hughes contends that the court of appeals' decision conflicts with several opinions from this Court; the County maintains that no such conflict exists. But this dispute is no longer the specific basis for our jurisdiction over this appeal. Even though the trial court's order here predates the amendments to our jurisdiction, we generally apply jurisdictional statutes as they exist at the time of our judgment.

6

*City of Austin v. Whittington*, 384 S.W.3d 766, 790 (Tex. 2012); *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 198 (Tex. 2007). This is "[b]ecause application of a new jurisdictional rule generally takes away no substantive right but simply impacts a tribunal's power to hear the case." *See Univ. of Tex. Sw. Med. Ctr. v. Estate of Arancibia*, 324 S.W.3d 544, 548 (Tex. 2010). Although the dispute about whether the court of appeals' decision is consistent with prior case law is no longer jurisdictional, that dispute remains central to the appeal's merits, which we turn to now.

III

Hughes contends that the order sustaining the County's jurisdictional plea conflicts with *Texas A&M University–Kingsville v. Lawson*. In *Lawson*, a plurality of this Court concluded that the government could not create immunity for itself through settlement. *Lawson*, 87 S.W.3d at 521-22. Thus, when the government agrees to settle a claim for which it lacks immunity, the government cannot assert governmental immunity to bar a subsequent suit on the agreement. *Id.* Hughes submits that is precisely what occurred in the trial court: the County has created immunity for itself by exchanging a claim for which it lacks immunity for a settlement agreement on which, according to the lower courts, it cannot be sued.

The court of appeals concluded that *Lawson*'s reasoning did not apply either because the MPA was not a settlement agreement or because the County's governmental immunity was never waived or otherwise abrogated in the SMU Litigation. 553 S.W.3d at 6-7. The appellate court reasoned that the MPA was not a settlement agreement because the parties "did not seek relief from each other" in the SMU Litigation, so "there were no claims between Hughes and the County to

7

settle." *Id*. But even assuming the MPA was a settlement agreement, the court concluded *Lawson* still would not apply because the County's intervention in the probate proceedings initiated by SMU did not "waive" its immunity vis-a-vis Hughes's subsequent claim to the minerals. *Id*. Thus, in the court's view, even if the MPA settled something, it did not settle a claim for which the County lacked immunity as *Lawson* requires.

Contrary to the court of appeals' view, Hughes contends the MPA was a settlement agreement because the parties' cross-assignment of their respective rights to the contested mineral interests settled their adverse claims as to each other in the SMU Litigation. Hughes also complains that the court's view of the County's immunity in the SMU Litigation conflicts with our reasoning and analysis in *Reata Construction Co. v. City of Dallas,* 197 S.W.3d 371 (Tex. 2006). He submits that a governmental entity that voluntarily interjects itself into probate litigation to claim title to property abrogates immunity as to competing title claims under *Reata*'s rationale.

In *Reata*, we said it was fundamentally unfair for a governmental entity to petition a court for affirmative relief while simultaneously asserting governmental immunity to bar another party's related and offsetting claims against that entity. *Id*. at 375-76 (citing *Guar. Trust Co. v. United States*, 304 U.S. 126, 134-35 (1938) and *Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 813 (Tex. 1983)). We reasoned that by seeking affirmative relief in the courts the government abrogated any claim to immunity, at least to the extent the opposing party's claims were germane to and offset those asserted by the government. *Id*. at 376-77. We later explained that *Reata*'s limited abrogation of sovereign immunity was not a waiver of immunity by the government's act of initiating suit, but rather was a limitation on the "contours of immunity" itself. *See City of Dallas v. Albert*, 354

8

S.W.3d 368, 374 (Tex. 2011) (stating that *Reata* did not alter the basic principles which are "(1) the boundaries of sovereign immunity are determined by the judiciary" and "(2) waivers of sovereign immunity . . . must generally be found in actions of the Legislature"). The adverse claims in *Reata* concerned monetary damages, and we concluded that Reata's counterclaim against the City of Dallas was not barred to the extent it might offset the City's affirmative claim for monetary relief against Reata. *Reata*, 197 S.W.3d at 378.

The court of appeals acknowledges *Reata*'s "voluntary litigation 'exception' to immunity," but distinguishes *Reata* on its facts. 553 S.W.3d at 5. According to the court, *Reata*'s "exception" does not apply in this case because the parties "did not [formally] seek relief from each other" in the SMU Litigation nor did their competing claims involve an offset of monetary damages. *Id*. at 6. Hughes submits that *Reata*'s application is not dependent on the assertion of monetary damages but rather on the relationship of the parties' adverse claims. He maintains that the issue whether offsetting adverse title claims to the same property are immune from suit cannot be determined by whether the opposing parties are asserting claims seeking damages "against each other" as in prior cases, but rather must be found in the basic policy principles enunciated by this Court in *Reata* and other cases when defining the limits of that immunity. We agree and turn next to the judicial principles that define the boundaries of governmental immunity.

IV

Sovereign and governmental immunity are common-law concepts that generally protect the State and its political subdivisions from the burdens of litigation. *Harris Cty. v. Annab*, 547 S.W.3d 609, 612 (Tex. 2018). Governmental immunity refers to the protection afforded the state's political

9

subdivisions, such as the County here. *Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 694 n.3 (Tex. 2003). Sovereign immunity typically refers to the protection afforded the State and its various agencies, but the term is also used more broadly to refer to the immunity enjoyed by any state or government actor. *Id.*

The doctrine of sovereign immunity has been part of Texas jurisprudence since the days of the Republic. *See Bd. of Land Comm'rs v. Walling*, Dallam 524, 526 (Tex. 1843) (discussing the doctrine in the courts of the Republic); *Hosner v. DeYoung*, 1 Tex. 764, 769 (Tex. 1847) (recognizing the doctrine after Texas joined the Union). In tracing the doctrine's justification back to its presumed origins—origins that predate not only the Republic of Texas but also the United States—we have observed that "the stated reasons for immunity have changed over time." *Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 431 (Tex. 2016). But as established in Texas, the doctrine has generally been considered "a rule of necessity." *State v. Brannan*, 111 S.W.2d 347, 348 (Tex. Civ. App.–Waco 1937, writ ref'd). At its core, the doctrine recognizes that "if the government should undertake to guarantee to the public the carefulness of all its officers, agents, and employees, it would soon become involved in endless embarrassments, difficulties, and losses which would be so subversive to the public interest as to compel it to abandon all but the bare essentials of a public government." *Id.* Sovereign immunity thus serves to prevent governmental paralysis. It protects the State and its political subdivisions from endless litigation, while leaving to the Legislature to determine how and "when to allow tax resources to be shifted 'away from their intended purposes toward defending lawsuits and paying judgments.'" *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015) (quoting *Tex. Nat. Res. Conservation Comm'n v.*

*IT-Davy*, 74 S.W.3d 849, 853-54 (Tex. 2002) (plurality op.)). The doctrine further restrains the courts from intruding into matters that are more properly reserved to the other branches of government. *Id*.

The foregoing assumes, however, that the government is an unwilling litigant, haled into court by a private plaintiff. The considerations that support the doctrine do not apply equally when the government invokes the jurisdiction of the courts to assert its own claims. And even though the Legislature has generally assumed responsibility for determining when and how to waive sovereign immunity, it remains a matter for the courts to determine first whether sovereign immunity exists. *Wasson Interests*, 489 S.W.3d at 432. Thus, we have determined that when a governmental entity asserts claims for affirmative relief in court, the entity does not have immunity from suit for opposing claims that are germane, connected, and properly defensive to the entity's claims, to the extent that the claims of the private litigant offset those asserted by the governmental entity. *Reata*, 197 S.W.3d at 378-77. We have reasoned that the government cannot complain about the burdens of litigation in this context because it has voluntarily undertaken them by affirmatively asserting its own claims. *C. Borunda Holdings, Inc. v. Lake Proctor Irrigation Auth.,* 540 S.W.3d 548, 553 (Tex. 2018) (per curiam). Moreover, separation-of-powers concerns are not implicated to the extent the government seeks affirmative relief. Indeed, such affirmative action by the government invokes the judiciary's duty to afford fundamental fairness in the administration of justice to all litigants. *Id*. In short, governmental entities that elect to pursue affirmative claims "are bound to participate in the litigation process as an ordinary litigant." *Albert*, 254 S.W.3d at 377.

11

Here, the County intervened in probate to assert its title claim under the will's residuary clause to property that had passed to SMU for the purpose of endowing a department chair. The County claimed the endowment's purpose had been accomplished. The property the County's intervention put in issue was "all of the [decedent's] interest in the oil, gas, and other minerals in what is known as the Duwain E. Hughes Ranchlands." Thus, what the court of appeals characterized as the heirs' competing claim "for the funds going to SMU," 553 S.W.3d at 6, was a suit for title to the unsevered minerals that after being produced generated funds also claimed by SMU, the County, and the heirs.

Because the minerals devised to SMU had fully funded the bequest's sole purpose, the heirs asserted that "title to the remaining properties immediately reverted" to the heirs at law. The heirs also specifically negated the County's claim to the minerals by using the County's own theory of a lapsed bequest against it. They argued that the sole purpose of the residuary gift to the County no longer existed, causing a partial intestacy, which required title to the mineral interests to pass to the heirs at law rather than the County.

Without question, the County was a voluntary litigant. *See Reata*, 197 S.W.3d at 375, 377. By affirmatively invoking the will's residuary clause, the County necessarily implicated the claims of all those who opposed the County's recovery under the clause. Moreover, the heirs' adverse claim was germane, connected, and properly defensive and offsetting to the County's affirmative suit for title. *See id.* at 378. Because the County and the heirs could not both have superior title to these mineral interests, the heirs' adverse claim served to inferentially rebut the County's affirmative claim for relief. *See Albert*, 354 S.W.3d at 375. The County's intervention thus invoked

12

jurisdiction over all adverse claims to title, which the County knew had to be adjudicated for it to be awarded title. Moreover, the County's voluntary invocation of the judicial process subjected it to the same rules, risks, and costs as every other litigant unless the principles that informed the boundaries of sovereign immunity in *Reata* dictate a different result here. We conclude they do not.

The SMU Litigation concerned who, among the competing claimants, was entitled to a gift. Litigation over a gift does not implicate taxpayer dollars or otherwise threaten the public treasury. The litigation thus does not invoke the primary policy concerns supporting immunity from suit—the payment of taxpayer dollars subject to legislative discretion or judicial intrusion on exercising that discretion. *See Brown & Gay Eng'g,* 461 S.W.3d at 121. The County was therefore not immune from the adverse title claims asserted by either the university or the heirs in the SMU Litigation, and the court of appeals erred in holding otherwise. *See* 553 S.W.3d at 6-7 (concluding that "the County's intervention in the SMU Litigation does not fall outside the 'contours of immunity' set out in *Reata*" and that "the County did not waive [sic] its immunity by intervening in the SMU Litigation"). We conclude that County's intervention in the SMU Litigation and its affirmative claim to the disputed mineral interests abrogated the County's governmental immunity as in *Reata*.

The court of appeals also proposes to limit *Lawson* "to circumstances in which the government's immunity is statutorily waived." *Id*. at 7. But no principled distinction can be drawn between a claim that lies outside the contours of governmental immunity as in *Reata* and one that lies within such immunity, but for which the Legislature has provided a waiver. In either instance, the government lacks immunity from suit either because immunity has been abrogated or annulled to the limited extent explained in *Reata* or because the Legislature has chosen to waive immunity

13

under its own terms. The court of appeals accordingly erred in rejecting *Lawson* based on its assumption of the County's immunity in the SMU Litigation.

V

The court of appeals' refusal to apply *Lawson* also rests on its belief that the MPA agreement was not a settlement agreement because it failed to settle anything. The court characterized the MPA as a joint defense agreement in which the parties agreed to pursue the litigation against SMU and split the proceeds of any settlement. *Id*. at 6. But it was more than that.

Before the MPA agreement, the County and heirs each claimed a superior right to the property. Their respective claims were not only adverse, but mutually exclusive. If one prevailed, the other could not. The MPA settled that adversity by the cross-assignment of "50% of all mineral interests" and "50% of the net proceeds" the County and heirs actually received in the SMU Litigation. If either prevailed, or SMU settled, they shared equally in the proceeds.

The court of appeals focused on one of the recitals in the agreement's preamble that stated "the agreement was 'in no way intended to eliminate or reduce in any fashion the causes of action, claims or rights held by the heirs-at-law or the County.'" *Id*. at 3. But the contractual terms of the MPA in fact reduce the rights of one of the parties in the property if indeed either has an enforceable claim to it. Moreover, the agreement does not merely anticipate a monetary settlement from SMU. The MPA provides for an equal division not only of any net proceeds but also of all mineral interests actually received in the lawsuit, providing further that the heirs are to retain or be assigned the executive rights in those interests. An award of mineral interests in the lawsuit suggests that one of the parties to the MPA might prevail on its mutually exclusive claim to the minerals and become

14

obligated to assign half the award to the other party. And if the County were the one to prevail, the MPA required it to assign away the executive rights as well. Thus, despite its preamble, the MPA agreement did propose to eliminate or reduce the claims or rights of its signatories as to each other in the SMU Litigation.

The trial court's order, which granted the County's plea to the jurisdiction, included a handwritten notation that the MPA was "in fact a mutual Settlement Agreement." We agree with that notation even though the substance of the court's order is otherwise erroneous. The MPA settled the adversity that existed between the County and the heirs in the SMU Litigation, granting each a 50% interest in the others' claims and vesting "all control over prosecution and/or settlement of the litigation" jointly in the signatories. This agreement together with the settlement the parties jointly negotiated with SMU resulted in the release of all their shared claims and put an end to the litigation.

\* \* \*

*Lawson* provides that a governmental entity cannot create immunity for itself by settling a claim for which it lacks immunity only to assert immunity from suit in a subsequent action to enforce the government's agreement. *Lawson*, 87 S.W.3d at 521-22. Contrary to the court of appeals' decision here, we conclude that the *Lawson* rule applies in this case. The MPA agreement settled the adverse title claims asserted by the heirs and the County and for which the County lacked immunity. The court of appeals' judgment is accordingly reversed and the cause remanded to the trial court for further proceedings.

15

_____
John P. Devine
Justice

Opinion Delivered: March 8, 2019