# Supreme Court of Texas

## No. 20-0033

Pharr–San Juan–Alamo Independent School District,

*Petitioner*,

v.

Texas Political Subdivisions Property/Casualty Joint Self Insurance Fund,

*Respondent*

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

**Argued September 14, 2021**

JUSTICE BOYD delivered the opinion of the Court.

The parties in this case dispute whether an automobile-liability insurance policy requires the insurer to defend and indemnify the insured against claims for damages arising from an accident involving the use of a "golf cart." We hold the insurer had no duty to defend the insured because the term "golf cart" does not refer to a vehicle "designed for travel on public roads" and thus does not refer to a "covered auto." And because the evidence confirms that the accident in this case did not

result from the use of a vehicle designed for travel on public roads, we hold the insurer has no duty to indemnify the insured. Although we disagree with the court of appeals' reasoning, we affirm its judgment reversing the trial court's judgment and remanding the case to that court.

## I.
## Background

The Pharr-San Juan-Alamo Independent School District obtained automobile-liability insurance from the Texas Political Subdivisions Property/Casualty Joint Self Insurance Fund. The policy requires the Insurance Fund to indemnify the School District by paying "all sums" the School District "legally must pay as damages because of bodily injury or property damage to which this self-insurance applies," if those damages are "caused by an accident and result[] from the ownership, maintenance or use of *a covered auto*." [Emphasis added.] According to the policy's definitions, the term "auto" means "a land motor vehicle . . . *designed for travel on public roads* but does not include mobile equipment." [Emphasis added.] The term "mobile equipment" means certain types of "land vehicles," including "[b]ulldozers, farm machinery, forklifts and *other vehicles designed for use principally off public roads*." [Emphasis added.] In addition to the duty to indemnify, the policy imposes on the Insurance Fund the "duty to defend any suit asking for these damages."

This dispute arose when Lorena Flores, acting as next friend of her minor daughter Alexis, sued the School District and its employee, Cristoval DeLaGarza, Jr. Flores alleged in her petition that Alexis "was severely injured after being thrown from a golf cart." More specifically,

2

Flores alleged that DeLaGarza, while acting within the course and scope of his employment with the School District, "recklessly and negligently operated" the "golf cart" when "he suddenly, and without warning, turned the golf cart abruptly, thereby throwing Alexis Flores from the vehicle." The petition did not provide any additional details about the accident or about the "golf cart."

The School District requested that the Insurance Fund provide a defense against Flores's claims and indemnify the School District against any resulting liability. The Insurance Fund refused, asserting that the policy did not provide coverage because a "golf cart" is not designed for travel on public roads and thus is not an "auto"—and instead is "mobile equipment"—as the policy defines those terms. When the parties failed to resolve this definitional dilemma, the Insurance Fund filed this suit seeking a declaratory judgment that it had no duty to defend the School District. The School District filed a counter-claim for declaratory judgment that the policy required the Insurance Fund to defend and indemnify the School District.[1]

---

[1] After the Insurance Fund denied a defense, the School District demanded a defense from the Texas Association of Public Schools Property and Liability Fund, from which the School District had obtained a general-liability (as opposed to automobile-liability) insurance policy. The TAPS Fund initially agreed to provide a defense and filed a plea to the jurisdiction on the School District's behalf, asserting that governmental immunity barred Flores's claim and the Texas Tort Claims Act did not waive that immunity because the "golf cart" was not a "motor vehicle." *See* TEX. CIV. PRAC. & REM. CODE §§ 101.021(1)(a), .051 (waiving governmental immunity against claims arising from the use of a "motor vehicle" or "motor-driven vehicle"). When the trial court denied the plea, the TAPS Fund withdrew its defense, asserting that the order "determined that this golf cart was a motor vehicle" and its general-liability policy did not cover claims arising from motor-vehicle accidents. The

Discovery in this suit and in Flores's suit against the School District produced additional information about the accident. DeLaGarza worked for the School District as a certified athletic trainer, and Alexis was a high-school student who assisted DeLaGarza as part of her school's sports-medicine student-trainer program. On the day of the accident, Alexis and another student trainer were helping DeLaGarza transport equipment from the school's field house to a football field. With DeLaGarza driving the "golf cart" and the students as passengers, they made several round trips, driving on sidewalks, the parking area, an on-campus road, the bus-loading area, and the running track. Alexis testified that DeLaGarza drove the cart "as fast as it could go" and at one point "jerk[ed] the [steering] wheel to the left," throwing Alexis from the vehicle onto the track. DeLaGarza denied that he was driving fast or that he turned recklessly. In any event, Alexis tore an anterior cruciate ligament, underwent surgery, and developed an infection that required her to be hospitalized for several weeks.

---

School District then re-urged its demand for a defense and indemnity from the Insurance Fund, but the Insurance Fund again denied the demand and filed this suit.

The School District later asserted third-party claims against the TAPS Fund in this suit, but ultimately dismissed those claims after those parties reached a settlement. When the Insurance Fund learned that the TAPS Fund had paid to settle the School District's claims, the Insurance Fund obtained leave to amend its pleadings to assert the "one-satisfaction rule," arguing that it was "entitled to a credit and offset for the full amount" the TAPS Fund had paid to the School District. The Insurance Fund argues that the trial court erred by failing to grant that credit, but we need not reach that issue in light of our holding that the Insurance Fund's policy does not provide coverage for Flores's claims. The TAPS Fund is not a party to this appeal.

4

Discovery also produced additional details about the "golf cart" DeLaGarza was driving. It was "an older model, electric type commonly seen on golf courses," except that it was modified by adding a "wooden bed" or "platform" to the rear, to hold coolers and other equipment and supplies. It was a "normal golf cart you would see at a golf course," was "not street legal," and was "used only on campus property, mainly from the field house to the athletic fields. It travel[ed] mainly on sidewalks, short internal streets, parking lots and athletic fields and tracks." "Any other use of the golf cart was incidental."

While this case was pending, the court hearing Flores's suit against the School District conducted a bench trial, found the School District liable for Alexis's injuries, and entered a final judgment ordering the School District to pay Flores $100,000, the maximum amount allowed under the Texas Tort Claims Act. *See* TEX. CIV. PRAC. & REM. CODE § 101.023(b). Meanwhile, in this case, the Insurance Fund and the School District filed competing summary-judgment motions addressing both the duty to defend and the duty to indemnify.[2] Both

---

[2] The procedural background is actually more complicated and involved several different summary-judgment motions. The Insurance Fund initially filed a motion seeking summary judgment that it owed no duty to defend or indemnify the School District. The trial court entered a "final order" denying that motion and dismissing the Insurance Fund's claims. The Insurance Fund appealed, but the court of appeals dismissed the appeal for want of jurisdiction, holding that the "final judgment" was not final because it did not dispose of the parties' claims for attorney's fees. On remand, the Insurance Fund filed a second summary-judgment motion, again addressing both the duty to defend and the duty to indemnify. The School District then filed its counter-claim for declaratory relief and its own summary-judgment motion addressing only the duty to defend. After the trial court denied the Insurance Fund's second summary-judgment motion, the School District filed a combined traditional

5

parties relied on the insurance policy and on Flores's petition in the underlying suit. The School District also filed and relied on additional documents, including (1) deposition excerpts regarding the "golf cart" from which Alexis was thrown, (2) print-outs of portions of the website of E-Z-Go, a golf-cart manufacturer, and (3) a Wall Street Journal article entitled "Invasion of the Golf Carts; As Electric Vehicles Migrate Onto Public Streets, Should we be Worried?"

The trial court determined as a matter of law that the policy requires the Insurance Fund to defend and indemnify the School District. In a series of orders, it denied the Insurance Fund's summary-judgment motions, granted the School District's motions, and entered a final judgment requiring the Insurance Fund to pay the School District the costs it incurred in defending Flores's suit and the $100,000 it paid to satisfy the judgment in that suit, plus post-judgment interest. The Insurance Fund appealed, and the court of appeals reversed, holding that neither party was entitled to summary judgment on either the duty to defend or the duty to indemnify. 628 S.W.3d 486, 496 (Tex. App.—Corpus Christi–Edinburg 2019).

On the duty to defend, the appellate court first held that it could consider extrinsic evidence (including the testimony regarding the golf cart involved in Alexis's accident, the E-Z-Go website, and the Wall Street Journal article) because the evidence was relevant only to the insurance-coverage dispute (that is, whether a "golf cart" may qualify as

---

and no-evidence motion for summary judgment addressing both the duty to defend and the duty to indemnify. The Insurance Fund then filed a motion for reconsideration of its second summary-judgment motion or, alternatively, a third motion for summary judgment.

an "auto") and not relevant to the merits of Flores's claims against the School District. *Id.* at 494. Based on this holding, the court concluded the trial court correctly denied the Insurance Fund's summary-judgment motion because the evidence established that "the term 'golf cart' has an expanded meaning in today's lexicon," such that it may include vehicles that are designed for travel on public roads. *Id.* at 495. But the court nevertheless concluded that the trial court erred by granting the School District's summary-judgment motion because the extrinsic evidence "clearly raised a material fact question about the design of the golf cart" from which Alexis was thrown. *Id.* at 496. And finally, because the Insurance Fund had not relied on extrinsic evidence to support its summary-judgment motion, the court declined to "decide whether the extrinsic evidence in this case conclusively *precludes* coverage." *Id.* (emphasis added).

On the duty to indemnify, the court of appeals held that the School District could not obtain a *no-evidence* summary judgment because it bore the burden of proving that the "golf cart" Alexis was thrown from was an "auto," rather than "mobile equipment," and the evidence created a genuine issue on that fact. *Id.* at 493–94.

Concluding that neither party carried its summary-judgment burden on either the duty to defend or the duty to indemnify, the court of appeals reversed the trial court's judgment and remanded the case to that court. The School District petitioned this Court for review, but the Insurance Fund did not.

7

## II.
## Duties to Defend and Indemnify

The School District raises two issues in this Court, one addressing the Insurance Fund's duty to defend and one addressing its duty to indemnify. The duty to defend, which "is a creature of contract," generally requires a liability insurer "to defend its insured against claims or suits seeking damages covered by the policy." *Loya Ins. Co. v. Avalos*, 610 S.W.3d 878, 880–81 (Tex. 2020). The duty to indemnify, which also arises from the contract's terms, requires the insurer "to pay all covered claims and judgments against [the] insured." *D.R. Horton-Tex., Ltd. v. Markel Intern. Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009). "Whether a claim triggers an insurer's duty to defend and whether a claim eventually is covered or excluded for purposes of indemnity are different questions." *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010). The "distinct and separate duties," *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 822 (Tex. 1997), are not interdependent, *see King v. Dall. Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002), and "are rarely coextensive," *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310 (Tex. 2006). Because the two duties "differ in scope, they are invoked under different circumstances." *Id.*

We have held that a "plaintiff's factual allegations that potentially support a covered claim [are] all that is needed to invoke the insurer's duty to defend[]; whereas, the facts actually established in the underlying suit control the duty to indemnify." *Id.* So depending on the factual allegations and the actual facts, "an insurer may have a duty to defend but, eventually, no duty to indemnify." *Farmers Tex. Cnty. Mut.*

*Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997). Conversely, "an insurer may have a duty to indemnify its insured even if the duty to defend never arises." *D.R. Horton-Tex.*, 300 S.W.3d at 741. We thus address the duties separately here, beginning with the duty to defend.

## III.
## The Duty to Defend

We held long ago that the duty to defend depends not "on what the facts are or what might finally be determined to be the facts," but "only on what the facts are alleged to be." *Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.*, 387 S.W.2d 22, 25 (Tex. 1965). To determine whether the duty existed, we considered only the allegations made within the petition in the underlying lawsuit and the terms of the insurance policy, "without reference to the truth or falsity of such allegations and without reference to what the parties know or believe the true facts to be, or without reference to a legal determination thereof." *Id.* at 24; *see also Argonaut Sw. Ins. Co. v. Maupin*, 500 S.W.2d 633, 635–36 (Tex. 1973).

Under this "eight-corners" or "complaint-allegation" rule,[3] the insurer has a duty to defend if the underlying petition alleges facts that fall within the scope of the insurance policy's coverage. *King*, 85 S.W.3d at 187. We have applied this rule somewhat liberally in favor of the insured by resolving "all doubts regarding the duty to defend in favor of

---

[3] The "eight-corners" label derives from the fact that the "four corners" of "only two documents are ordinarily relevant to the determination of the duty to defend: the policy and the pleadings of the third-party claimant." *GuideOne*, 197 S.W.3d at 308. The "complaint-allegation" label derives from the requirement that courts determine the duty to defend by looking only to the allegations in the plaintiff's complaint or petition, as opposed to evidence regarding the actual facts. *Trinity Universal*, 945 S.W.2d at 821.

the duty," *id.*, and by recognizing the duty if the petition alleges facts that "*potentially* support a covered claim," *GuideOne*, 197 S.W.3d at 310 (emphasis added).

We recently recognized a narrow exception to the eight-corners rule, allowing courts to consider evidence that the insured colluded with the plaintiff in the underlying suit to fraudulently create coverage that otherwise would not exist. *Loya*, 610 S.W.3d at 881–82. Meanwhile, other courts have addressed a broader exception, which the United States Court of Appeals for the Fifth Circuit described as allowing courts to consider extrinsic evidence "when it is initially impossible to discern" from the eight corners of the policy and the underlying petition "whether coverage is potentially implicated *and* when the extrinsic evidence goes solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case." *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 531 (5th Cir. 2004); *see also Richards v. State Farm Lloyds*, 597 S.W.3d 492, 497 (Tex. 2020) (acknowledging the *Northfield* exception's "widespread use").

In a separate case we also decide today, we approve something like this broader exception, holding for the first time that "Texas law permits consideration of evidence under a standard similar to that articulated in *Northfield*." *See Monroe v. BITCO*, — S.W.3d —, 2022 WL —, at *— (Tex. Feb. 11, 2022). We explain in *Monroe* that the eight-corners rule "remains the initial inquiry to be used to determine whether a duty to defend exists." *Id.* at ___. But we conclude in *Monroe* that

10

courts may consider extrinsic evidence, in addition to the policy and the underlying petition,

> if the underlying petition states a claim that could trigger the duty to defend, and the application of the eight-corners rule, due to a gap in the plaintiff's pleading, is not determinative of whether coverage exists, . . . provided the evidence (1) goes solely to an issue of coverage and does not overlap with the merits of liability, (2) does not contradict facts alleged in the pleading, and (3) conclusively establishes the coverage fact to be proved.

*Id.* at ___.[4]

The court of appeals relied on the *Northfield* exception in this case, considering extrinsic evidence regarding the "golf cart" from which Alexis was thrown as well as "golf carts" in general, and concluded that some "golf carts" are designed for use on public roads but a fact issue exists as to whether this accident involved such a "golf cart." 628 S.W.3d at 495. The School District argues the court of appeals erred by considering extrinsic evidence. According to the School District, because Flores's petition referred only to a "golf cart" without providing any additional details, and because the term "golf cart" could "potentially"

---

[4] We explained in *Monroe* that this exception differs from the exception as the Fifth Circuit described it in *Northfield* in that (1) the exception applies only if the underlying petition does not "contain the facts necessary to resolve the question of whether the claim is covered," rather than "if it is initially impossible to discern from the pleadings and policy 'whether coverage is *potentially* implicated,'" (2) the exception does not require that the extrinsic evidence relate to a "fundamental" coverage issue, and (3) the extrinsic evidence must conclusively establish the coverage fact at issue. *Monroe*, — S.W.3d at ___ (quoting *Northfield*, 363 F.3d at 531).

refer to vehicles that are designed for travel on public roads, the Insurance Fund had a duty to defend regardless of what any extrinsic evidence might reveal about the golf cart actually involved in the accident. The Insurance Fund, in turn, urges us to adopt the *Northfield* exception and approve the court of appeals' consideration of extrinsic evidence.[5]

Applying the eight-corners rule, we conclude that Flores's petition did not allege a claim for which the policy provided coverage. And we further conclude that the *Monroe* exception to the eight-corners rule does not apply in this case.

---

[5] Initially, the Insurance Fund argues that the School District waived any complaint about the court of appeals' consideration of extrinsic evidence because the School District filed such evidence in support of its summary-judgment motion and thereby "opened the door to the introduction of controverting evidence." In fact, the Insurance Fund contends that this Court lacks jurisdiction over the School District's appeal because "a party may not complain on appeal of the improper admission of evidence if the complaining party introduced the same evidence or evidence of a similar character." *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 238 (Tex. 2011). We disagree that any such waiver would affect our jurisdiction, which extends to any "appealable order or judgment of the trial courts if the court determines that the appeal presents a question of law that is important to the jurisprudence of the state." TEX. GOV'T CODE § 22.001(a). The School District presented to this Court a question of law important to the state's jurisprudence, and thus established this Court's jurisdiction over the appeal. Whether procedural hurdles prevent us from addressing the question does not affect our jurisdiction. *See Hughes v. Tom Green County*, 573 S.W.3d 212, 216 (Tex. 2019); *see also* TEX. R. APP. P. 25.1(b) ("The filing of a notice of appeal by any party invokes the appellate court's jurisdiction over all parties to the trial court's judgment or order appealed from. Any party's failure to take any other step required by these rules, including the failure of another party to perfect an appeal . . . , does not deprive the appellate court of jurisdiction but is ground only for the appellate court to act appropriately, including dismissing the appeal.").

## A.     The eight-corners rule

Consistent with today's decision in *Monroe*, our "initial inquiry" is whether Flores's petition states a claim that could trigger the duty to defend under the eight-corners rule. *Monroe*, — S.W.3d at ___. We conclude it did not.

Flores's petition alleged that Alexis's injuries resulted from the negligent use of a "golf cart." The term "golf cart" does not appear within the insurance policy. As with any other contract, *see Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998) ("[W]e interpret insurance policies in Texas according to the rules of contract construction."), we determine the meaning of an undefined term as used in an insurance policy by applying its "ordinary and generally accepted meaning," as construed "in context and in light of the rules of grammar and common usage," *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015). Here, however, the question involves the meaning of a term used in a pleading (Flores's petition), not a term used in the insurance policy. Nevertheless, because our objective in both instances is to construe the meaning of an undefined term as used within a legal context, we will discern and apply the common, ordinary meaning of the term "golf cart," in light of the context of its use within Flores's petition.

To determine the common, ordinary meaning of undefined terms used in contracts, statutes, and other legal documents, "we typically look first to their dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities." *Tex. State Bd. of Examiners of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511

13

S.W.3d 28, 35 (Tex. 2017). Considering these sources here, we conclude the term "golf cart" does not refer to vehicles designed for travel on public roads.

Dictionaries consistently define the term "golf cart" to refer to a motorized cart designed to transport golfers around a golf course. *See Golf cart*, DICTIONARY.COM, https://www.dictionary.com/browse/golf-cart (last visited Feb. 2, 2022) (defining "golf cart" to mean "a small, battery-powered, three- or four-wheel vehicle used for transporting one or two golfers and their equipment around a golf course"); *Golf cart*, WEBSTER'S 9TH NEW COLLEGIATE DICTIONARY 538 (2003) (defining "golf cart" to mean "a motorized cart for carrying a golfer and his equipment over a golf course - called also golf car"); *Golf cart*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/golf%20cart (last visited Feb. 2, 2022) (defining "golf cart" to mean "a motorized cart for carrying golfers and their equipment over a golf course"); *Golf cart*, COLLINSDICTIONARY.COM, https://www.collinsdictionary.com/dictionary/english/golf-cart (last visited Feb. 2, 2022) (defining "golf cart" to mean "a small, electric, carlike vehicle designed to carry two golfers and their golf clubs around a golf course").

In the same way, Texas statutes define the term "golf cart" to mean "a motor vehicle designed by the manufacturer primarily for use on a golf course." TEX. TRANSP. CODE § 551.401. By this definition, our statutes carefully distinguish the term "golf cart" from terms describing other types of vehicles and devices, including an "electric personal

14

assistive mobility device,"[6] a "neighborhood electric vehicle,"[7] a "motor-assisted scooter,"[8] a "plug-in hybrid motor vehicle,"[9] an "all-terrain

[6] *See* TEX. TRANSP. CODE § 551.201 (defining "electric personal assistive mobility device" to mean "a two non-tandem wheeled device designed for transporting one person that is: (1) self-balancing; and (2) propelled by an electric propulsion system with an average power of 750 watts or one horsepower").

[7] *See id.* § 551.301 (defining "neighborhood electric vehicle" to mean "a vehicle that can attain a maximum speed of 35 miles per hour on a paved level surface and otherwise complies with Federal Motor Vehicle Safety Standard 500 (49 C.F.R. Section 571.500)"); *see also* TEX. GOV'T CODE § 2158.001(5) (defining "neighborhood electric vehicle" to mean "a motor vehicle that: (A) is originally manufactured to meet, and does meet, the equipment requirements and safety standards established for 'low-speed vehicles' in Federal Motor Vehicle Safety Standard 500 (49 C.F.R. Section 571.500); (B) is a slow-moving vehicle, as defined by Section 547.001, Transportation Code, that is able to attain a speed of more than 20 miles per hour but not more than 25 miles per hour in one mile on a paved, level surface; (C) is a four-wheeled motor vehicle; (D) is powered by electricity or alternative power sources; (E) has a gross vehicle weight rating of less than 3,000 pounds; and (F) *is not a golf cart*") (emphasis added); TEX. HEALTH & SAFETY CODE § 392.001(8) (same).

[8] *See* TEX. TRANSP. CODE § 551.351(1) (defining "motor-assisted scooter" to mean "a self-propelled device with: (i) at least two wheels in contact with the ground during operation; (ii) a braking system capable of stopping the device under typical operating conditions; (iii) a gas or electric motor not exceeding 40 cubic centimeters; (iv) a deck designed to allow a person to stand or sit while operating the device; and (v) the ability to be propelled by human power alone," but not including "a pocket bike or a minimotorbike").

[9] *See* TEX. GOV'T CODE § 2158.001(6) (defining "[p]lug-in hybrid motor vehicle" to mean "a vehicle that: (A) draws motive power from a battery with a capacity of at least four kilowatt-hours; (B) can be recharged from an external source of electricity for motive power; and (C) is a light-duty motor vehicle capable of operating at highway speeds, *excluding golf carts* and neighborhood electric vehicles" (emphasis added)).

vehicle,"[10] a "sand rail,"[11] a "recreational off-highway vehicle,"[12] a "utility vehicle,"[13] and other types of "off-highway vehicles."[14] Unlike these types of vehicles, and consistent with the dictionary definitions, our statutes use the term "golf cart" to refer to a vehicle designed "primarily for use on a golf course." *Id.*

---

[10] *See* TEX. TRANSP. CODE § 551A.001(1) (defining "[a]ll-terrain vehicle" to mean "a motor vehicle that is: (A) equipped with a seat or seats for the use of: (i) the rider; and (ii) a passenger, if the motor vehicle is designed by the manufacturer to transport a passenger; (B) designed to propel itself with three or more tires in contact with the ground; (C) designed by the manufacturer for off-highway use; (D) not designed by the manufacturer primarily for farming or lawn care; and (E) not more than 50 inches wide").

[11] *See id.* § 551A.001(3) (defining "[s]and rail" to mean "a vehicle, as defined by Section 502.001, that: (A) is designed or built primarily for off-highway use in sandy terrains, including for use on sand dunes; (B) has a tubular frame, an integrated roll cage, and an engine that is rear-mounted or placed midway between the front and rear axles of the vehicle; and (C) has a gross vehicle weight, as defined by Section 541.401, of: (i) not less than 700 pounds; and (ii) not more than 2,000 pounds").

[12] *See id.* § 551A.001(5) (defining "[r]ecreational off-highway vehicle" to mean "a motor vehicle that is: (A) equipped with a seat or seats for the use of: (i) the rider; and (ii) a passenger or passengers, if the vehicle is designed by the manufacturer to transport a passenger or passengers; (B) designed to propel itself with four or more tires in contact with the ground; (C) designed by the manufacturer for off-highway use by the operator only; and (D) not designed by the manufacturer primarily for farming or lawn care").

[13] *See id.* § 551A.001(6) (defining "[u]tility vehicle" to mean "a motor vehicle that is *not a golf cart*, as defined by Section 551.401, or lawn mower and is: (A) equipped with side-by-side seating for the use of the operator and a passenger; (B) designed to propel itself with at least four tires in contact with the ground; (C) designed by the manufacturer for off-highway use only; and (D) designed by the manufacturer primarily for utility work and not for recreational purposes" (emphasis added)).

[14] See *id.* § 551A.001(1-d) (defining "[o]ff-highway vehicle" to mean "(A) an all-terrain vehicle or recreational off-highway vehicle; (B) a sand rail; or (C) a utility vehicle").

The School District notes, however, that although our statutes narrowly define the term "golf cart" and generally prohibit registering a "golf cart for operation on a highway," TEX. TRANSP. CODE § 551.402(a), they do permit "golf carts" to be operated in certain master-planned communities and for limited distances on certain low-speed highways "for transportation to and from a golf course," *id.* § 551.403(a)(1) & (3), (b).[15] And they also permit certain municipalities and counties to allow "golf carts" to be operated on low-speed highways for any purpose, so long as they are equipped with headlamps, taillamps, reflectors, a parking brake, and mirrors. *Id.* §§ 551.404, .4041. And several other statutes recognize that "golf carts" may be operated on highways under certain other circumstances and for other specified purposes.[16]

---

[15] *See also id.* §§ 551.4031 (authorizing counties, municipalities, and the Texas Department of Transportation to prohibit such operation of a golf cart on a highway based on a determination "that the prohibition is necessary in the interest of safety"), 601.052(a)(2-a) (providing that the statutory requirement of liability insurance does not apply to "a golf cart that is operated only as authorized by Section 551.403").

[16] *See, e.g., id.* §§ 547.703(d) (requiring a golf cart "operated at a speed of not more than 25 miles per hour" to "display a slow-moving-vehicle emblem when it is operated on a highway"), 551.452(a) (permitting the Texas Department of Motor Vehicles to "issue distinguishing license plates" for a golf cart "operated by a motor carrier for the purpose of picking up and delivering mail, parcels, and packages," if the golf cart is "equipped with headlamps, taillamps, reflectors, a parking brake, and mirrors, in addition to any other equipment required by law"), .453 (permitting motor carriers to operate golf carts bearing such distinguishing license plates "on a public highway that is not an interstate or a limited-access or controlled-access highway and that has a speed limit of not more than 35 miles per hour"); .455 (permitting municipalities and counties to allow motor carriers to operate golf carts bearing such distinguishing license plates for such purpose "on all or part of a public highway that: (1) is in the corporate boundaries of the municipality; and (2) has a speed limit of not more than 35 miles per hour").

According to the School District, these statutes demonstrate that the term "golf cart" refers to a vehicle that *may* be "designed for travel on public roads," and thus *may* constitute an "auto" as the insurance policy defines that term. We disagree. Although these statutes allow a "golf cart" to be *operated* on a public road under certain circumstances, they do not demonstrate that the term "golf cart" includes vehicles that are *designed* to be operated on such roads. To the contrary, the extensive legislation permitting "golf carts" to be operated on public roads under limited circumstances delineates the exception, not the rule; the divergence, not the definition. It merely permits a "golf cart"—which it describes as a vehicle designed "primarily for use on a golf course," consistent with the dictionary definitions—to be used on a public road under limited circumstances.

In addition to the term's dictionary and statutory definitions, we find guidance in the way courts from other jurisdictions have consistently used and construed the term "golf cart," specifically, to refer to a vehicle designed for use on a golf course, and not to a vehicle designed for travel on public roads.[17] We agree: the common, ordinary

---

[17] *See Progressive Mountain Ins. Co. v. Graybeal*, No. 2:11-CV-00176-WCO, 2012 WL 13018492, at *7 (N.D. Ga. Sept. 20, 2012) (holding that a "golf cart" was "simply" not a "vehicle 'designed for operation principally on public roads' within the plain meaning of the Policy language"); *State Farm Mut. Auto. Ins. Co. v. Baldassini*, 909 F. Supp. 2d 1363, 1367, 1369 (S.D. Fla. 2012), *aff'd*, 545 Fed. Appx. 842 (11th Cir. 2013) (holding that insurance policy's definition of "car" as "a land motor vehicle with four or more wheels, which is designed for use mainly on public roads" "unambiguous[ly]" did not include golf carts, noting that evidence that golf carts may be used on public roads "on a limited basis" demonstrates that they were not designed for that main purpose, and stating that city regulations permitting golf carts on roads "shed[] no light"

meaning of the term "*golf* cart" necessarily refers to a cart designed for use on a golf course, not for travel on public roads.

Applying the eight-corners rule, we conclude that the Insurance Fund had no duty to defend the School District against Flores's claims because Flores's allegation that Alexis was "thrown from a golf cart" did

on the manufacturer's "intentions when it designed the [golf cart]"); *Bailey v. Netherlands Ins. Co.*, 615 F. Supp. 2d 1332, 1338 (M.D. Fla. 2009) ("The Court finds that the golf cart is not an 'auto' under the Subject Policy [containing an identical definition of 'auto' as in this case] because it is not designed to be operated on public roads."); *Dowdle v. Miss. Farm Bureau Mut. Ins. Co.*, 697 So. 2d 788, 791 (Miss. 1997) (upholding summary judgment on grounds that "golf carts are recreational vehicles 'designed for use principally off public roads' and are thus excluded under the terms of the [uninsured motorist] policy" at issue); *Truck Ins. Co. v. Corraro*, No. NNHCV186082179S, 2019 WL 4898705, at *5 (Conn. Super. Ct. Sept. 6, 2019) ("Clearly, golf carts, which are designed to be used on golf courses in connection with the recreational sport of golf, are designed for use *off* public roads."); *Andrade v. Tradition Golf Club of Wallingford, LLC*, No. NNHCV136039774S, 2014 WL 486818, at *5 (Conn. Super. Ct. Jan. 9, 2014) (holding that golf cart was not "motor vehicle" under insurance policy defining "motor vehicle" to exclude "any vehicle or equipment . . . [d]esigned mainly for use off public roads while not on public roads"); *Herring v. Horace Mann Ins. Co.*, 795 So. 2d 209, 211 (Fla. Dist. Ct. App. 2001) (rejecting insurer's argument that "golf carts are motor vehicles because they may be used on public roads and because, if properly equipped, golf carts are capable of being licensed for use on the public highways" because "[a] golf cart, patently, is designed for operation at low speed on a golf course or for similar sporting or recreational purposes, or for transportation on private property"); *East v. Labbe*, 735 A.2d 371, 373 (Conn. Super. Ct. 1998) ("[T]his golf cart would not be a motor vehicle for the purposes of General Statutes § 14–293a, as the vehicle is not suitable for operation on the highway because it is not designed for such use."), *aff'd*, 735 A.2d 370 (Conn. App. Ct. 1999) and 746 A.2d 751 (Conn. 2000); *Progressive Cas. Ins. Co. v. Dunn*, 665 A.2d 322, 326 (Md. App. 1995) ("Any engine-driven wheeled vehicle—even an airplane or a massive earth-mover—*can* be driven on streets and roads. The test is not ultimate possibility, however, but whether the vehicle is *intended* for that mode of travel. A golf cart, of the kind described in this case, is certainly not intended for such travel.").

not include an allegation that she was thrown from a "vehicle designed for travel on public roads."

## B.     Extrinsic evidence under *Monroe*

Under today's decision in *Monroe*, we must apply the eight-corners rule to determine whether the Insurance Fund had a duty to defend the School District against Flores's claim, and may not consider extrinsic evidence *unless*: (1) Flores's petition alleged "a claim that could trigger the duty to defend," (2) a "gap" in her petition leaves us unable to determine whether coverage exists by applying the eight-corners rule, (3) the facts the extrinsic evidence would relate to solely concern the coverage issue and do not overlap with the liability merits, (4) those facts would not contradict facts alleged in Flores's petition, and (5) the extrinsic evidence "conclusively establishes the coverage fact to be proved." *Monroe*, — S.W.3d at ___.

The "fact" at issue here is whether the vehicle from which Alexis was thrown was "designed for travel on public roads." We agree with the court of appeals that this fact relates solely to the coverage issue and does not overlap with the merits of Flores's claims: the School District was liable if DeLaGarza negligently operated the "golf cart" regardless of whether the "golf cart" was designed for travel on public roads.

But the other *Monroe* factors do not support the consideration of extrinsic evidence in this case. This is because a "golf cart," as we have explained, is designed for travel on a golf course and not on public roads. By alleging that Alexis was thrown from a "golf cart," Flores's petition left no "gap" that would prevent us from determining whether the duty exists. Mere disagreements about the common, ordinary meaning of an

20

undefined term do not create the type of "gap" *Monroe* requires. And in the absence of such a gap, any extrinsic evidence that Alexis was actually thrown from something other than a "golf cart" would contradict the facts alleged in Flores's petition. *Id.* at ___. If Flores had alleged only that Alexis was thrown from a "vehicle," without any indication of the type of vehicle or whether it was designed for travel on public roads, a gap would exist that prevents us from determining the duty to defend based solely on the petition's allegations and the policy's provisions, and extrinsic evidence proving that the vehicle was or was not designed for use on public roads would not contradict the general allegation that the accident involved a "vehicle." But by pleading that the vehicle was a "golf cart," the petition provided all the information necessary to determine the duty to defend. As a result, the *Monroe* exception does not apply, and the eight-corners rule governs the duty to defend in this case.

## C.    "Sources" other than "extrinsic evidence"

The School District contends that the exhibits it filed in this case—particularly the print-outs from the E-Z-Go website and the Wall Street Journal article—do not constitute "extrinsic evidence" but instead, like dictionaries, statutes, and court opinions, are permissible even under the eight-corners rule as mere "source[s] that would aid the Court in understanding the meanings and usages of words." We need not decide whether these "sources" constitute the kind of "extrinsic evidence" the eight-corners rule bars, however. Even if we do consider these sources, they do not support the School District's contentions regarding the common, ordinary meaning of the term "golf cart."

The E-Z-Go website print-outs depict and describe vehicles that look very much like "golf carts" but are designed for travel on public roads. But the website nowhere uses the term "golf cart" to refer to these vehicles. To the contrary, the website provides four separate main links—labeled "Personal," "Golf," "Parts & Accessories," and "About E-Z-Go"—and the pages provided by the School District depicting vehicles designed for travel on public roads appear under the "Personal" link, not under the "Golf" link. Consistent with the manufacturer's categorization of these "personal" vehicles, the website never refers to them as "golf carts," but instead refers to them only by their model names ("Freedom RXV," "Express S6," and "2Five") or as a "low speed vehicle." Nothing in the website print-outs indicates that the manufacturer uses the term "golf cart" to refer to vehicles it designs for use on public roads.

Nor does the Wall Street Journal article establish that the term "golf cart" includes vehicles designed for travel on public roads. Although the article's headline refers to the "Invasion of the Golf Carts," the article itself never refers to vehicles designed for travel on public roads as "golf carts." It refers to "golf-cart-like vehicles," "souped-up golf carts," "electric cars," "errand cars," "city cars," "low speed vehicles," and "neighborhood electric vehicles." As previously mentioned, the Transportation Code defines a "neighborhood electric vehicle" separately from a "golf cart." *Compare* TEX. TRANSP. CODE § 551.301 *with id.* §551.401. The only discussion of "golf carts" in the article notes that people often operate golf carts "on low-speed roads within communities that are built around golf courses" and occasionally—and "sometimes illegal[ly]"—on "short errands" on public roads. The article's

22

distinction between the vehicles it discusses and "golf carts" is consistent with the common, ordinary meaning provided in dictionaries and the Texas statute.

Applying the eight-corners rule, we conclude the Insurance Fund had no duty to defend the School District because Flores's petition did not allege a claim that could fall within the policy's coverage for liabilities resulting from the use of a vehicle designed for travel on public roads. Although we disagree with the court of appeals' reasoning, it correctly reversed the summary judgment in favor of the School District on the Insurance Fund's duty to defend.

## IV.
## The Duty to Indemnify

Unlike the duty to defend, which depends on pleaded allegations, "the facts actually established in the underlying suit control the duty to indemnify." *GuideOne*, 197 S.W.3d at 310). So to determine whether the Insurance Fund had a duty to indemnify the School District against Flores's claims, we must consider not whether the term "golf cart" could potentially include a vehicle designed for travel on public roads, but whether the vehicle from which Alexis was actually thrown was designed for travel on public roads.

The trial court held it was, granting summary judgment requiring the Insurance Fund to indemnify the School District. The court of appeals reversed, but mostly on a procedural technicality. Specifically, the court of appeals determined that, on the duty to indemnify, the School District had filed only a no-evidence summary-judgment motion, thus placing the burden on the Insurance Fund to submit evidence proving that the vehicle from which Alexis was thrown was not a

"covered auto." Because the insured bears the initial burden of proving coverage under an insurance policy, *see Gilbert*, 327 S.W.3d at 124, the court concluded that the School District could not rely on a *no-evidence* motion to obtain summary judgment on that issue. 628 S.W.3d at 493–94.

The School District argues that the court of appeals erred in this holding because the coverage dispute in this case ultimately involves an *exclusion* to the policy's coverage, and the insurer—not the insured—bears the burden of proving that an exclusion applies. *See JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 603 (Tex. 2015) ("To avoid liability, the insurer then has the burden to plead and prove that the loss falls within an exclusion to the policy's coverage."). The School District notes that the policy defines "auto" to mean a vehicle "designed for travel on public roads *but does not include mobile equipment*," and then defines "mobile equipment" to mean certain types of "land vehicles," including "[b]ulldozers, farm machinery, forklifts and *other vehicles designed for use principally off public roads*." [Emphases added.] Characterizing the reference to "mobile equipment" as an exclusion to the coverage the policy otherwise provides, the School District argues that, to avoid summary judgment, the Insurance Fund bore the burden to prove that the vehicle from which Alexis was thrown was "mobile equipment" "designed for use principally off public roads."

The court of appeals disagreed, holding that the policy's reference to "mobile equipment" constitutes part of the definition of the term "auto" and thus part of the description of the policy's coverage, rather than an exclusion to that coverage. 628 S.W.3d at 493. We need not

resolve that issue here, however, because we conclude that the summary-judgment evidence conclusively established that the vehicle from which Alexis was thrown was not "designed for travel on public roads." As explained, the policy defines "auto" to mean a vehicle "designed for travel on public roads but does not include mobile equipment." Under this definition, a vehicle may be "designed for travel on public roads" and yet not be an "auto" because it is also "designed for use principally off public roads" (or it constitutes "mobile equipment" for some other reason). But if it is not "designed for travel on public roads," it is not an "auto" regardless of whether it constitutes "mobile equipment."

Here, the evidence conclusively established that the vehicle from which Alexis was thrown was not "designed for travel on public roads." The undisputed evidence established that it was "an older model, electric type [golf cart] commonly seen on golf courses," was a "normal golf cart you would see at a golf course," and was "not street legal." The School District asserts that some evidence establishes that the vehicle was "actually used and routinely driven on public roads, including on the day of this accident," apparently referring to the route DeLaGarza took from the field house to the football field where the accident happened. But even assuming that route included "public roads" and that the vehicle was "actually used and routinely driven" on them, that does not establish that the vehicle was "*designed* for travel on public roads." Nothing in the record indicates or even suggests that the vehicle was anything other than a "golf cart"—that is, "a motor vehicle designed by the manufacturer primarily for use on a golf course." TEX. TRANSP.

25

CODE § 551.401. Because the School District failed to establish that the vehicle from which Alexis was thrown was "designed for travel on a public road," and thus an "auto," we conclude, albeit for different reasons, that the court of appeals correctly reversed the summary judgment in favor of the School District on the Insurance Fund's duty to indemnify.

## V.
## Conclusion and Disposition

On the duty to defend, we hold the trial court erred by granting summary judgment for the School District because the allegation in Flores's pleading that Alexis was injured when she was thrown from a "golf cart" did not assert a claim for damages "resulting from the ownership, maintenance or use of a covered auto." And on the duty to indemnify, we hold that the trial court erred by granting summary judgment for the School District because the summary-judgment evidence did not conclusively establish that the vehicle from which Alexis was thrown was a "covered auto." We thus affirm the court of appeals' judgment reversing the trial court's judgment, but for different reasons.

Under our reasoning, the Insurance Fund would be entitled to a summary judgment on both the duty to defend and the duty to indemnify. The Insurance Fund filed motions for summary judgment on both duties in the trial court and appealed the trial court's denial of those motions, but the court of appeals affirmed. 628 S.W.3d at 495. The Insurance Fund requests in its brief that this Court reverse the court of appeals' judgment and render judgment in favor of the Insurance Fund, but we cannot grant that relief because the Insurance Fund did not file

26

a petition for review in this Court. *See* TEX. R. APP. P. 53.1 ("A party who seeks to alter the court of appeals' judgment must file a petition for review.") We must therefore remand the case to the trial court in accordance with the court of appeals' judgment, which we hereby affirm.

_____
Jeffrey S. Boyd
Justice

**OPINION DELIVERED:** February 11, 2022