# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00200-CV

---

**TGP Public Schools, Inc., d/b/a The Gathering Place, Appellant**

**v.**

**Powell Law Group, LLP, as successor in interest to Powell, Youngblood & Taylor, LLP, Appellee**

---

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-20-007150, THE HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant TGP Public Schools, Inc., d/b/a The Gathering Place (TGP) appeals from the trial court's denial of its plea to the jurisdiction, which sought dismissal based on governmental immunity for the causes of action brought by appellee Powell Law Group, LLP, as successor in interest to Powell, Youngblood & Taylor, LLP (the "Firm"). For the following reasons, we reverse the trial court's denial of the jurisdictional plea and render judgment dismissing the claims against TGP for want of jurisdiction.

## BACKGROUND

TGP is a public open-enrollment charter school that began serving students in 2020. Joanna Klekowicz and Ryan York, the Co-CEOs of TGP, signed an engagement letter with the Firm on or around April 27, 2020 (the "Contract"), which provided for the Firm to provide general counsel services to TGP and did not require an upfront retainer (the "Contract").

The Firm contends that, between signing the Contract and September 3, 2020, the Firm performed legal services on behalf of TGP, mostly relating to securing a bridge loan from a private lender to fund TGP's operations (the "Bridge Loan"). On May 29, 2020, the Co-CEOs signed a commitment letter between TGP and the third-party lender laying out the preliminary terms of the Bridge Loan (the "Commitment Letter"). The TGP Board later expressly ratified the Commitment Letter and authorized the Co-CEOs to finalize the Bridge Loan. The relationship between the Co-CEOs and the Firm ultimately soured, with the Firm submitting invoices totaling $19,378.28, which remain unpaid.

On November 20, 2020, the Firm filed its lawsuit, asserting that TGP breached the Contract with the Firm by failing to pay any of the outstanding attorneys' fees invoices. TGP responded by filing a plea to the jurisdiction, asserting that it was protected from suit by governmental immunity and that the Firm had failed to demonstrate that its claim falls within the scope of Section 271.152 of the Local Government Code, which provides a limited waiver of immunity for certain contractual claims.[1]

Following an evidentiary hearing, the trial court denied the plea. TGP then filed the present appeal. *See City of Magnolia 4A Econ. Dev. Corp. v. Smedley*, 533 S.W.3d 297, 299–300 (Tex. 2017) (per curiam) ("A party may appeal an interlocutory order that grants or

---

[1] The Firm subsequently amended its petition to assert an ultra vires cause of action, alleging that Klekowicz and York, as Co-CEOs, were individually liable for ultra vires actions insofar as they acted without approval by TGP's Board. However, the Co-CEOs were not included as individual defendants in the underlying action, and TGP's plea to the jurisdiction specifically challenged only the Firm's claim for breach of contract and the related request for attorney's fees. Thus, any such ultra vires claim against the co-CEOs therefore is not before us in this appeal. *Cf. Phillips v. McNeill*, 635 S.W.3d 620, 628 (Tex. 2021) (explaining that "'ultra vires suits do not attempt to exert control over the state—they attempt to reassert the control of the state' over one of its officials" (quoting *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009)).

denies a plea to the jurisdiction by a governmental unit." (quoting Tex. Civ. Prac. & Rem. Code § 51.014(a)(8))).

**STANDARD OF REVIEW**

Open-enrollment charter schools and charter-holders, just like public school districts, are entitled to government immunity from liability and suit. *See* Tex. Educ. Code § 12.1056(a); *see also El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 530 (Tex. 2020) (holding that "open-enrollment charter schools and charter-holders are entitled to governmental immunity"). "Immunity from liability bars enforcement of a judgment against a school district, and immunity from suit bars prosecution of a suit brought against it." *El Paso Educ. Initiative*, 602 S.W.3d at 526; *see also Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006) ("In Texas, governmental immunity has two components: immunity from liability, which bars enforcement of a judgment against a governmental entity, and immunity from suit, which bars suit against the entity altogether." (footnote omitted)). While governmental immunity can be waived, we defer to the Legislature to do so by statute. *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011).

Generally, governmental immunity implicates subject matter jurisdiction, *see Houston Belt & Terminal Ry. v. City of Houston*, 487 S.W.3d 154, 160 (Tex. 2016), and therefore may be asserted through a plea to the jurisdiction, *see Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). The burden is on the party asserting claims against the governmental party to affirmatively demonstrate the trial court's jurisdiction. *See id.* at 225. Therefore, when a government party challenges jurisdiction on the basis of immunity, the party asserting the claims must affirmatively demonstrate the court's jurisdiction by alleging

a valid waiver of immunity. *Ryder Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922, 927 (Tex. 2015).

Whether a trial court has subject matter jurisdiction is a question of law we review de novo. *Texas Nat. Res. Conserv. Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002). We construe the pleadings liberally in favor of the plaintiff and consider the pleader's intent. *Konark Ltd. P'ship v. BTX Schools, Inc.*, 580 S.W.3d 194, 196 (Tex. App.—San Antonio 2018, pet. denied). When resolving issues presented by a plea to the jurisdiction, a court may consider evidence that the parties have submitted and must do so when necessary to resolve the jurisdictional issues. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554–55 (Tex. 2000). When the jurisdictional evidence is undisputed, the trial court rules on the plea to the jurisdiction as a matter of law. *Miranda*, 133 S.W.3d at 228.

## DISCUSSION

On appeal, TGP argues that the trial court erred in denying its plea to the jurisdiction because the factual allegations and jurisdictional evidence fail to establish that either (1) the Firm's claims fall within the scope of the waiver of governmental immunity under Section 271.152 of the Texas Local Government Code or (2) TGP waived its immunity through its conduct. We address each of these arguments in turn.

### *Waiver of Immunity under Local Governmental Code Section 271.152*

Although open-enrollment charter schools are generally entitled to governmental immunity, parties contracting with such charter schools are not without recourse. Section 12.1056 of the Education Code provides a limited waiver of that immunity for breach-of-contract claims:

4

> An open-enrollment charter school is a local governmental entity as defined by Section 271.151, Local Government Code, and is subject to liability on a contract as provided by Subchapter I, Chapter 271, Local Government Code, and only in the manner that liability is provided by that subchapter for a school district.

Tex. Educ. Code § 12.1056(d). In turn, Section 271 of the Local Government Code provides:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

Tex. Loc. Gov't Code § 271.152.

Thus, three elements are required for a waiver of immunity under Section 271.152: "(1) the party against whom the waiver is asserted must be a 'local governmental entity' as defined by section 271.151(3), (2) the entity must be authorized by statute or the Constitution to enter into contracts, and (3) the entity must in fact have entered into a contract that is 'subject to this subchapter,' as defined by section 271.151(2)." *Williams*, 353 S.W.3d at 134–35 (citing Tex. Loc. Gov't Code § 271.151(2)–(3)). Under section 271.151(2), a contract "subject to this subchapter" includes "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is *properly executed* on behalf of the local governmental entity." Tex. Loc. Gov't Code § 271.151(2)(A) (emphasis added).

TGP does not dispute that it is an open-enrollment charter school, and thus a local governmental entity, nor that it is authorized to enter into contracts. *See Williams*, 353 S.W.3d at 134–35. Instead, TGP asserts that the Firm's factual allegations and the jurisdictional evidence fail to establish that the Contract was "properly executed." *El Paso Educ. Initiative*, 602 S.W.3d

5

at 530–31. The Supreme Court has cautioned that a contract for an open-enrollment charter school is not necessarily "properly executed" simply because it is signed by a charter school representative. *See id.* at 532. "Rather, to avail itself of a waiver of immunity, a party asserting a breach-of-contract claim against an open-enrollment charter school must demonstrate that the contract's execution comports with the authority the legislature granted the school in its charter, including the statutory and regulatory requirements placed on open-enrollment charter schools entering (or seeking to enter) contractual relationships." *Id.*

Under the applicable rules of the Texas Administrative Code, "[a]n open-enrollment charter grants to the governing body of a charter holder the authority to operate a charter school." 19 Tex. Admin. Code § 100.1101(b) (2022) (Tex. Educ. Agency, Delegation of Powers and Duties). The powers and duties of the charter school governing body include executing a contract that "authorize[s] the expenditure or obligation of state funds." *El Paso Educ. Initiative*, 602 S.W.3d at 532 (quoting 19 Tex. Admin. Code § 100.1033(b)(14)(C)(ii)). The governing body's powers and duties "shall not be delegated" except by "specifying the power or duty delegated and the particular person or entity to which it is delegated" as part of filing "a request for a delegation amendment with the [Texas Education Agency] division responsible for charter schools." 19 Tex. Admin. Code § 100.1101(c). A charter school representative may have authority to negotiate a contract on behalf of the board, but ultimately the representative lacks the power to "properly execute" the contract "on behalf of" the board without express board approval. *El Paso Educ. Initiative*, 602 S.W.3d at 533. Accordingly, insofar as a charter school representative signs a contract with an outside party, that contract becomes "properly executed" only once either the school's charter is amended to authorize that specific representative to execute contracts on the board's behalf or the charter school's board

6

approves or ratifies the contract signed by the representative. *See id.* The parties do not dispute that TGP's Board has never amended the school's charter to allow for a delegation of the power or duty to enter into such contracts to the Co-CEOs, *see* 19 Tex. Admin. Code § 100.1101(c), and therefore whether the Contract was "properly executed" depends on whether the Board approved or ratified the Contract.

The trial court considered the following relevant evidence, in addition to the Firm's pleadings:

The April 27, 2020 Contract, signed by the Co-CEOs;

May 12, 2020 Board Meeting Agenda, which includes the following entry under "Announcements": "We have a new attorney and auditor: Geneva Taylor at Powell, Youngblood, and Taylor, LLP as well as [auditor name]";

May 20, 2020 email from Co-CEO to the Firm, stating "our previous council [sic] had no problem submitting PIA requests on our behalf to districts. If we need to obtain separate council [sic] for PIA requests please let us know and we will do so";

The May 29, 2020 Commitment Letter between TGP and the third-party lender, laying out the preliminary terms of the Bridge Loan and signed by the Co-CEOs;

July 1, 2020 Board Agenda, which included the following board resolution approval entry under "New Business": "Delegate Authority to Finalize [Bridge Loan] and Sign to [Co-CEOs]";

July 1, 2020 adopted Board Resolution regarding the Bridge Loan, which includes the following relevant terms (the "Bridge Loan Resolution"):

Section 2. That the Board of Directors of [TGP agrees] that the terms contained in the Commitment Letter are approved and the execution of the Commitment Letter by [Co-CEOs], is ratified.

Section 3. That [Co-CEOs] of [TGP] are hereby designated as Authorized Signatories for [TGP] with respect to the [Bridge] Loan and are hereby delegated the authority to sign, seal, make oath to, acknowledge, deliver and file any and all loan commitments, loan agreements, notes, pledges, security agreements, documents and other instruments of every nature, which may be necessary or proper to consummate the [Bridge] Loan in such form and containing such terms, provisions and conditions as the Authorized Signatories may deem necessary, appropriate or convenient, in their sole discretion (including without limitation, changes to any amounts described herein);

July 29, 2020 Board Agenda, which includes the following language under "New Business": "Review and approve legal representation" and "All voted in favor to accept the letter of engagement";

July 29, 2020 Board Minutes, which includes the following entry under "New Business": "Review and approve legal representation and confirm [Co-CEOs]'s delegated right to sign legal council's [sic] engagement letter" and "All voted in favor";

August 5, 2020 email from Co-CEO to different outside counsel, stating "Attached is our signed engagement letter and the board minutes approving the decision and delegating right to sign to [Co-CEOs]" and attaching the July 29, 2020 board minutes and the signed engagement letter;

The September 8, 2020 invoice listing the total unpaid attorneys' fees;

York's Affidavit executed on April 16, 2021, affirming that "the TGP Board of Directors did not authorize the Contract [with the Firm] or any amendments thereto. The TGP Board of Directors did not pass a delegation amendment to delegate authority to [Co-CEOs] to authorize the Contract";

Klekowicz's Affidavit executed on August 31, 2021, attesting to identical statements as the York Affidavit.

TGP contends that this jurisdictional evidence establishes that the Contract was never approved or ratified by its Board, and therefore the Contract was never "properly executed." We agree.

8

The Firm argues that the Contract was properly executed because the board agenda and minutes from July 29, 2020, both contain non-specific entries that the Board was to "[r]eview and approve legal representation" and that the Board voted in favor of confirming the Co-CEO's "delegated right to sign" legal counsel's engagement letter. In effect, the Firm argues that because these two entries do not explicitly state which legal representation is being authorized, that "ambiguity" is sufficient to create a fact issue that the Board approved or ratified the Contract. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009) ("If, however, the jurisdictional evidence creates a fact question, then the trial court cannot grant the plea to the jurisdiction, and the issue must be resolved by the fact finder."). However, before the trial court was also a 2020 email chain between the Co-CEOs and a different outside counsel firm, where that other outside counsel provided their engagement agreement on July 22, 2020 (i.e., seven days before the board meeting), and one of the Co-CEOs responded on August 5, 2020 (i.e., seven days after the board meeting), attaching the signed engagement letter and the July 29, 2020 board minutes "approving the decision and delegating rights to sign to" Co-CEOs. Beyond the negative inference that the non-specific entries *might* refer to the Firm because they do not expressly identify the relevant outside counsel, nothing else in the record indicates that the July 29, 2020 board agenda and minutes were referring to the Contract, which was signed three months earlier, rather than the engagement letter that Co-CEOs were corresponding about with other outside counsel contemporaneously with that same Board meeting. *See Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 771 (Tex. 2018) ("[W]e cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not."). Consequently, we disagree that a factfinder could reasonably infer that the phrase "review and approve legal representation," appearing in the

9

TGP's board materials months after the Contract was signed and directly referenced in other evidence as concerning a separate, distinct legal representation, refers to the Board's "review and approv[al]" of the then three-month-old Contract, *see City of El Paso*, 284 S.W.3d at 378 (explaining that standard only indulges "reasonable inference[s]" in favor of party defending from jurisdictional plea), especially in light of the other uncontroverted evidence in the record that the July 29, 2020 entries referred to TGP's other outside counsel, *see Miranda*, 133 S.W.3d at 228.

The Firm also argues that, because it was hired under the Contract to assist with the Bridge Loan, the Board subsequently ratified Contract when it passed the Bridge Loan Resolution, which delegated authority to the Co-CEOs to sign "any and all . . . documents and other instruments of every nature, which may be necessary or proper to consummate the [Bridge] Loan." But none of the evidence in the record indicates how hiring the Firm and signing the Contract was either "necessary or proper to **consummate** the Loan" between the third party lender and TGP. (Emphasis added.) Nor does that provision in the Board Loan Resolution mention ratification or include other language demonstrating that the Board intended the provision to provide a blanket ratification of all past action by the Co-CEOs relating to the Bridge Loan. *See Ratification*, Black's Law Dictionary (11th ed. 2019) (defining "ratification" as "[c]onfirmation and acceptance of a previous act, thereby making the act valid from the moment it was done").

If we were to read that provision in the Bridge Loan Resolution as providing such a blanket ratification for past Co-CEOs' actions, then that provision would necessarily also ratify the Co-CEOs' signing of the Commitment Letter, which occurred approximately one month before the Bridge Loan Resolution. Instead, the Bridge Loan Resolution included a separate,

10

express provision not only approving the terms of the Commitment Letter but also ratifying the Co-CEOs' signing of that letter. The absence of any similar provision expressly ratifying the Contract, which was signed three months before the Bridge Loan Resolution and two months before the Commitment Letter, indicates that the Board did not intend the authorization section in the Bridge Loan Resolution to provide a post hoc ratification of any previous Co-CEO action that may be related, however tenuously or closely, to the Bridge Loan. *See Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 (Tex. 2021) (per curiam) (explaining that contracts must be construed by considering broader context and avoiding "render[ing] contract language meaningless").

What is left in the pleadings and evidence before the trial court shows that the Contract was signed by the Co-CEOs on April 27, 2020; that an announcement on the May 2020 board agenda refers to TGP having a "new attorney" from the Firm; and that the Firm billed TGP for legal services. This evidence is analogous to the evidence rejected in *El Paso Education Initiatives*. In that appeal from a denial of a plea to the jurisdiction, the evidence showed that the president of a charter school district attended a board meeting and informed the board that she had identified a site for a new open-enrollment charter school and that she was negotiating a lease agreement with the property owner. *See El Paso Educ. Initiative*, 602 S.W.3d at 524. She then negotiated and signed a lease with the property owner, which included a requirement that the property owner construct two school buildings for the district's use. *Id.* at 525. Approximately a month later, the district repudiated the lease, but the property owner thereafter still pursued securing the construction of a building at the location. *Id.* at 525. Even though the board had been informed by the president about the lease negotiation, the president signed a lease, and the property owner took actions pursuant to the by-then-repudiated lease, the Texas

11

Supreme Court concluded that the charter school district still retained its governmental immunity because there was no evidence that the district's board "approved the lease, or that an amendment to the charter existed authorizing [the president] to act without board approval on behalf of the board." *Id.* at 533.

Similar to this case, evidence about the signing of the Contract, the announcement to the board, and the work undertaken by the Firm may demonstrate that the Firm was ostensibly undertaking legal work pursuant to the Contract, but none of that evidence shows the Board itself was presented with, and approved or ratified, the Contract. *See Saum v. City of Coll. Station*, No. 10-17-00408-CV, 2020 WL 7688033, at *5 (Tex. App.—Waco Dec. 22, 2020, pet. denied) (mem. op.) ("[P]ersons or entities contracting with governmental units are charged by law with notice of the limits of the authority of the governmental unit and are bound at their peril to ascertain if the contemplated contract is properly authorized." (quoting *Base-Seal, Inc. v. Jefferson County*, 901 S.W.2d 783, 788 (Tex. App.—Beaumont 1995, writ denied)); *accord Edminster, Hinshaw, Russ & Assocs., Inc. v. Downe Twp.*, 953 F.3d 348, 352 (5th Cir. 2020). Thus, even viewing this evidence in the light most favorable to the Firm, we conclude that the Firm has failed to present any supporting evidence to show that the Board approved or ratified the Contract. *See Alamo Heights*, 544 S.W.3d at 771. Accordingly, the Firm has failed to demonstrate that the Contract was "properly executed," and therefore its breach of contract claim against TGP does not fall within the scope of Section 271.152's limited waiver of governmental immunity. *See El Paso Educ. Initiative*, 602 S.W.3d at 532.[2]

---

[2] Three days after TGP filed its opening brief in this appeal, the trial court entered findings of fact and conclusions of law in support of its denial of the plea to the jurisdiction. However, the "factual findings" relevant to the issues on appeal are nothing more than legal conclusions and do not change our analysis of those issues. *See Seasha Pools, Inc. v. Hardister*,

***Waiver by Conduct***

In response to TGP's plea to the jurisdiction, the Firm also contends that even if its claims do not fall within the Section 271.152 waiver, a waiver of conduct exception to governmental immunity exists and applies based on the facts before us. *See Federal Sign v. Texas S. Univ.*, 951 S.W.2d 401, 408 n.1 (Tex. 1997) (noting that decision should not "be read too broadly" and that "[t]here may be other circumstances where the State may waive its immunity by conduct other than simply executing a contract"); *id.* at 412–13 (Hecht, J., concurring) (explaining that majority opinion does not decide certain hypothetical scenarios that "do suggest that the State may waive immunity by conduct other than simply executing a contract"); *see also Texas S. Univ. v. State St. Bank & Tr. Co.*, 212 S.W.3d 893, 907 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (concluding that waiver by conduct exception to immunity should be evaluated "on the facts of each case, not as a categorical matter or bright-line rule").

Other than the *State Street* decision from our sister court, the Firm has not directed this Court to any other decision that has recognized and applied a waiver-by-conduct exception to governmental immunity. Moreover, our Court has cautioned that since the Supreme Court decided *Federal Sign*, the Supreme Court has "declined repeated requests to recognize a 'waiver by conduct,' and has never gone further than its suggestion in *Federal Sign* that such a waiver *might* conceivably occur under some set of facts it has not yet seen." *City of New*

---

391 S.W.3d 635, 640 (Tex. App.—Austin 2012, no pet.) (explaining that "trial court's designation of items as findings of fact or conclusions of law is not controlling on appeal, and we may treat the court's ruling as a factual finding or legal conclusion regardless of the label used"); *see also Hegar v. Black, Mann, & Graham, L.L.P.*, No. 03-20-00391-CV, 2022 WL 567853, at *6 (Tex. App.—Austin Feb. 25, 2022, no pet.) (mem. op.) (reviewing conclusions of law de novo).

*Braunfels v. Carowest Land, Ltd.*, 432 S.W.3d 501, 521 (Tex. App.—Austin 2014, no pet.); *see also Ficke v. Ratliff*, No. 03-13-00136-CV, 2014 WL 857212, at *1 (Tex. App.—Austin Feb. 27, 2014, pet. denied) (mem. op.) ("While holding open the possibility that *some* set of facts *might* constitute conduct deemed to waive immunity, the supreme court has yet to identify any set of facts that would amount to such conduct."). This Court has therefore repeatedly declined to recognize an exception to governmental immunity for waiver by conduct without further guidance from the Supreme Court. *See, e.g., City of San Saba v. Higginbotham*, No. 03-17-00408-CV, 2018 WL 2016463, at *3 n.2 (Tex. App.—Austin May 1, 2018, no pet.) (mem. op.) ("[T]his Court has previously declined to recognize such 'waiver by conduct,' and we decline to do so now."); *Hughes v. Tom Green County*, 553 S.W.3d 1, 10 (Tex. App.—Austin 2017), *rev'd on other grounds*, 573 S.W.3d 212 (Tex. 2019) ("On the facts before us and in the absence of guidance from the Texas Supreme Court as to what actions might justify waiver by conduct, we decline to apply the 'waiver-by-conduct' exception to governmental immunity to the complained-of conduct in this case."); *Ficke*, 2014 WL 857212, at *1 ("The supreme court has yet to find a set of circumstances supporting the waiver-by-conduct exception to governmental immunity that it has alluded to, and we decline to do so on the record before us."); *In re Hays Cnty. Sheriff's Dep't*, No. 03-12-00343-CV, 2012 WL 6554815, at *3 (Tex. App.—Austin Dec. 12, 2012, no pet.) (mem. op.) ("Because of this, we have declined to recognize a waiver-by-conduct exception, absent further guidance from the supreme court."); *Labrado v. University of Tex. at El Paso*, No. 03-10-00009-CV, 2012 WL 43385, at *4 (Tex. App.—Austin Jan. 5, 2012, no pet.) (mem. op.) (rejecting waiver-by-conduct exemption because "[w]e may not recognize a waiver of immunity from suit that does not emanate from the Legislature in clear and unambiguous language"). The Supreme Court has not provided any additional guidance since

14

those decisions, and we therefore again decline to recognize an exception to governmental immunity for waiver by conduct here.

Because the Firm has failed to demonstrate a factual dispute that its claims fall within the scope of Section 271.152, and we decline to recognize waiver by conduct under the facts presented by the allegations and jurisdictional evidence in this case, TGP was entitled to governmental immunity. *See* Tex. Educ. Code § 12.1056(a); *see also El Paso Educ. Initiative*, 602 S.W.3d at 531–33. The trial court therefore lacked subject matter jurisdiction as to the claims against TGP. *See Texas Nat. Res. Conserv. Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002). We therefore sustain TGP's waiver issue.

## CONCLUSION

For these reasons, we reverse the trial court's denial of TGP's plea to the jurisdiction and render judgment as to the claims asserted against TGP and dismiss these claims for lack of jurisdiction.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Smith
  Dissenting Opinion by Justice Kelly

Reversed and Rendered

Filed: March 29, 2024